UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

| | |
|---|---|
| CORBIN J. HOWARD, individually and on behalf of others similarly situated,<br><br>    Plaintiff<br><br>vs.<br><br>BERRY GLOBAL, INC.,<br><br>    Defendant | )<br>)<br>)<br>)<br>) **COLLECTIVE ACTION PURSUANT TO**<br>) **29 USC § 216(b)**<br>)<br>) CASE NO.   3:21-cv-38<br>)<br>)<br>)<br>) |

***PLAINTIFF'S INDIVIDUAL AND FLSA COLLECTIVE ACTION COMPLAINT FOR DAMAGES***

### *I.  STATEMENT OF THE CASE*

Plaintiff Corbin J. Howard ("Howard") brings this collective action against Defendant Berry Global, Inc. ("Berry") pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 USC § 216(b), for overtime pay violations.  Howard brings this action for himself and for all current and/or former hourly-paid manufacturing employees of Berry who worked for Berry at one of its manufacturing facilities in the United States and who were similarly subjected to Berry's compensation schemes which resulted in the systematic failure to pay employees all earned overtime compensation.

Berry is and has been underpaying its hourly-paid employees' wages and overtime compensation on a systematic, class-wide basis as a result of an illegal timecard rounding policy and practice.  All hourly-paid Berry employees were similarly subjected to Berry's unlawful compensation scheme that required its hourly paid employees to perform, on an aggregate basis, significant work without payment of wages and/or overtime compensation.  To explain

generally, Berry is programming its timekeeping and payroll software and creating disciplinary rules which combine to create a non-neutral rounding scheme based on its employee time clock entries whereby Berry rounds work time entries only in Berry's favor and always to its employees' detriment. Berry's illegal timecard rounding practices (non-neutral timecard rounding) violate the FLSA and result in underpayment of overtime compensation.

Howard's collective action claims which are based upon Berry's illegal timecard rounding practices are perfect for collective action treatment and will be easy to prove. All of Berry's wage violations will be shown from a comparison of the face of Berry's pay stubs to employees and Berry's own time records for those same employees.

## II. FACTUAL ALLEGATIONS

1. Howard is a resident of the State of Ohio, and is domiciled in Eaton, Ohio. Eaton, Ohio is close to the eastern border of Indiana and is not far from Richmond, Indiana. Howard is a former employee of Berry. Howard worked at Berry's Richmond, Indiana manufacturing facility as an hourly-paid mold process technician. Howard worked for Berry from approximately 2008 until he was involuntarily terminated on or about May 8, 2020. From some time in 2016 until the termination of his employment, Howard worked for Berry as a "mold process technician."

2. Berry Global, Inc. was formed under the corporation laws of the State of Delaware, but its primary headquarters are in Evansville, Vanderburgh County, Indiana. Generally and historically, Berry has been a plastics manufacturer. Until 2017, the company called itself "Berry Plastics." Berry is an international corporation, and its stock is publicly traded on the New York Stock Exchange. On its website, Berry describes itself as employing 47,000 to 48,000 individuals worldwide with 295 facilities. Based upon information and belief,

Berry employs well over 20,000 individuals in the United States at manufacturing locations in at least 31 states in the U.S., including, but not necessarily limited to, Indiana, Kentucky, Ohio, Illinois, Wisconsin, Iowa, Texas, Oklahoma, Arkansas, Louisiana, Tennessee, Mississippi, Alabama, Georgia, Florida, North Carolina, South Carolina, Virginia, Kansas, Minnesota, Pennsylvania, New York, Massachusetts, Rhode Island, New Jersey, Maryland, South Dakota, Arizona, Nevada, Oregon and Washington.  Based upon information and belief, Berry employs tens of thousands of hourly-paid workers who will be potential FLSA opt-in plaintiffs at locations in all the 31 states listed in this paragraph.

3. Howard and his similarly situated coworkers are and were common victims of Berry's compensation scheme whereby it impermissibly and unlawfully rounded time clock punches in a manner that failed to pay Howard and all similarly situated employees for significant compensable work hours.

4. Berry has created a compensation scheme through a series of computer software commands (time punch rounding commands) written into its time clock software and payroll software, coupled with company disciplinary rules regarding tardiness, time clock punches and clocking out early, that ensure that Berry will always benefit from its time punch rounding scheme and guarantee that Berry will take an impermissible and unfair financial advantage over its employees by rounding in a non-neutral fashion that results in enormous sums of unpaid hourly wages owed to its employees on a cumulative basis.

5. For Howard and all its hourly-paid employees, Berry used and uses an electronic time keeping system.  Employees would clock in and out by scanning employee badges in a computerized time clock.  Using this time clock, the employee would record his/her actual time he/she began work for each shift and record the actual time the employee ends his/her work each

shift. If Berry paid its non-exempt, hourly-paid employees' wages and overtime based upon these time clock entries, Berry would likely have complied with the FLSA.

6. Berry does not pay its employees' hourly-paid wages and compensation based upon actual entries on Berry's own time punch records.

7. Importantly, Berry does not record its non-exempt, hourly-paid employees' work time in any other way. The only time records Berry has to base its payment of wages are the time records generated by the electronic time clock.

8. Berry has created a policy and practice whereby it significantly adjusts downward and deducts time from its non-exempt, hourly-paid employees' time records and pays its employees for less than their full time worked and full time reported on Berry's time clocks.

9. Based upon its long-standing policy and practice of manipulating and downwardly adjusting employee time records, Berry has been systematically underpaying its employees significant sums of wages and overtime compensation on a daily basis. The aggregate sum of unpaid wages for all U.S. based employees based upon Berry's non-neutral (and self-serving) rounding policy is very substantial on a daily, weekly, and an annual basis.

10. Based upon its long-standing practice of manipulating and downwardly adjusting employee time records, Berry has been systematically underpaying its employees significant sums of wages and overtime on a daily basis. Many employees, including Howard, have been underpaid wages and overtime compensation by up to twenty-one (21) minutes per shift and regularly by more than one hour per workweek.

11. Berry has implemented a rule that employees are not permitted to clock in more than seven (7) minutes prior to a scheduled shift start. Berry has programmed its time clocks to then round each employee time clock punch up in Berry's favor, to treat the employee as though

he/she clocked in to begin work at the scheduled work time. Employees lose up to seven minutes of compensable work time each shift as a result of this computer-programmed rounding command. This is particularly significant as Berry employees have to begin each shift by going to his/her locker and donning all necessary protective gear (called "PPE") that is required by Berry (and likely by law) in order for the employee to perform work in the factory. Employees, including Howard, would don all PPE (e.g., hardhats, special safety sleeves, leather gloves, long sleeve shirts, safety glasses, and face shields), a first principal work activity, and have started his/her paid work day before going to the Berry Time clock (which is very close to the locker room) and punching in for the day. After punching in on the time clock, employees walk to their respective work areas, which are generally only one minute walk or less. Howard and his fellow Berry employees would then meet with the employee he/she was about to replace for pre-shift changeover discussions and instructions. Berry requires that each employee be fully dressed, already equipped with PPE, and ready to begin production work at his/her workstation at this scheduled shift start-time.

12. To further show the non-neutral rounding scheme used by Berry, Berry has a corresponding rule that employees who clock in as little as one (1) minute after a scheduled shift start time will be disciplined for tardiness under Berry's "point system." Howard and his fellows were not given a seven (7) minute grace period to be late that mirrored the seven (7) minute rounding period Berry shaved off employee time punches.

13. To provide a specific and representative example of this shift start scheme, Howard was scheduled to work twelve (12) hour shifts that were to begin at 7:00 p.m. Howard was only allowed to clock in at 6:53 p.m., with his PPE (as described above), but all of Howard's time was rounded or shaved in Berry's favor as though Howard clocked in at 7:00 p.m. Howard

was also subject to discipline each shift is he were to clock in late, even if he only clocked in at 7:01 p.m. Rounding at the beginning of any work shift was programmed or rigged such that only Berry could profit.

14. Howard and all of his similarly situated production coworkers were required to continue production work and remain in their required PPE at their workstations until the later of 1) the "scheduled quitting time," or 2) the actual time a replacement employee showed up at the workstation and relieved the prior employee from work. Berry's machines were in constant operation. Berry also created a work rule that promised discipline, again under its "point system," to any employee who left a workstation prior to scheduled quitting time (or clocked out early without permission). Berry stopped paying wages to employees at this scheduled quitting time, but employees had to spend significant additional time working before they could clock out and leave work. Employees would have to 1) wait for the scheduled shift end time and/or the later time that a relief employee took over the workstation, 2) walk back to the locker area, 3) doff and put away all of PPE in their lockers, and finally, 4) clock out and leave work for the day. This took significant time. Only after all of this work was performed to the final principal work activity of the day (final doffing of PPE), could the employee clock out for the day and leave the Berry facility.

15. Berry programmed a shift-ending rounding scheme in its time clock and pay roll software that would round Howard and every similar employee's shift ending time punch from the greater, actual time, to the scheduled shift end. Berry actually created a computer-programmed command and a rule that Howard and his fellow employees could not be paid at all for the first fifteen (15) minutes following a scheduled shift end. Time was always shaved down,

in Berry's favor and to its employees' detriment.  Rounding was never applied in a manner that benefitted employees.

16. To provide a specific and representative example of this shift ending rounding scheme, Howard was scheduled to work twelve (12) hour shifts that were to begin at 7:00 p.m. and end at 7:00 a.m.  Howard was required to work until 7:00 a.m. or later and was not allowed to clock out until 1) he was relieved by his replacement, 2) walked back to the locker area, and 3) doffed all of his PPE back in his locker.  All of Howard's shift ending time after 7:00 a.m. was rounded or shaved down in Berry's favor as though Howard clocked out at 7:00 a.m.  Howard was also subject to discipline each shift is he were to clock out early, even if he only clocked out at 6:59 a.m.  Rounding at the end of any work shift was programmed or rigged such that only Berry could profit.  Again, as described above, Howard would have to provide fifteen (15) or more minutes beyond his scheduled shift end time in order to be paid for any minutes of work after the scheduled shift end time.  Even with this, Berry's rounding scheme was never applied in a manner that benefitted Howard instead of Berry.

17. Finally, to provide specific detail of FLSA violations, all of the time Berry rounded off of Howard's time clock punches and Howard's actual time spent working constituted unpaid overtime at least every second week Howard worked.  Howard worked twelve hour shifts on a rotating basis.  On one week, Howard was scheduled to work at least three 12-hour shifts, or 36 hours, but in each following week, Howard was scheduled to work at least four 12-hour shifts, or 48 hours.  The additional unpaid work time that Berry rounded or shaved from Howard's pay would at least serve as unpaid overtime.  Howard's last hourly rate of pay was $25.27 per hour.  Howard estimates he lost an hour of pay every week, but can state with confidence that he lost at least one hour of overtime compensation every second week - at least

26 unpaid overtime hours per year. For 2019 alone, Berry would owe Howard unpaid overtime of $985.53 (26 overtime hours x $25.27 x 1.5). Doubled under the FLSA's presumptive liquidated damage provision, for that one year alone, 2019, Berry would owe Howard damages of $1,971.06.

18. Berry's computer-programmed time rounding scheme, coupled with its disciplinary rules, harmed Howard's similarly situated coworkers in the same way on a company-wide basis. Berry's unpaid overtime hours and FLSA damages are representative of those owed to Berry's U.S. based workers subjected to the same time clock and time clock software and same pay roll system and software.

19. Pursuant to its systematic, class-wide practice, Berry is not compensating its hourly-paid employees for all work time at the beginning of each employee's shift from the time the employee clocks in and begins changing into his required PPE. Additionally, pursuant to its practice, Berry systematically deducts time from its employee time records that represents time spent working by the employee after the scheduled shift end-time ("scheduled quitting time"), even though the work at the workstation, work doffing PPE, and work time walking back to the locker room to doff PPE was performed and recorded on Berry's time keeping system.

20. All of Berry's time rounding practices were intentionally computer-programmed and performed to Berry's advantage and to the detriment and harm of Berry's employees. Berry's timecard rounding practices are not neutral.

21. Berry intentionally and knowingly violated its employees' rights to earned wages through Berry's illegal timecard rounding practices and the company's conscious and deliberate decision not to pay employees for all work time related to the donning and doffing of PPE,

walking to work stations and actual production work performed at work stations which occurred before the official shift scheduled start time and the official scheduled quitting time.

22. Systematically, Berry rounds time off both ends of its employees' work shifts to benefit Berry and to harm employees. Berry underpays wages to its employees by its use of this rounding system. If employees were paid wages on a continuous workday basis - paid from actual, first principal work activity (recorded with an actual time punch in) to the actual last principal work activity (recorded with an actual time punch out) - employees would be paid more wages and more overtime on a daily, weekly and annual basis. Just as importantly and because this case is about Berry's computer-programmed and non-neutral time rounding scheme, if Berry had paid its employees their hourly wages based upon the employees' actual time punches reflecting the employees actual hours worked, the employees would have been paid far more in wages than they were actually paid after Berry's one-sided, non-neutral rounding program was applied. Under the FLSA, rounding should result, over time, in a net neutral result that favors neither employer nor employees. Berry's system is rigged to greatly benefit Berry and to greatly harm the company's employees.

23. By way of this Complaint, Howard seeks for himself and for all other similarly situated hourly-paid employees all wages, all overtime compensation, and any and all liquidated damages owed to each. Additionally, Howard seeks payment of his reasonable attorney's fees, costs and expenses.

### III. COLLECTIVE ACTION ALLEGATIONS

24. Howard incorporates herein by reference paragraphs 1 - 23 above.

25. Howard brings his claims in his capacity as an individual, and as a collective action on behalf of other current and former Berry hourly paid employees who worked for the

company at one or more of its many U.S. manufacturing facilities. All said individuals were common victims of Berry's scheme to avoid paying wages and full overtime compensation for all hours worked and recorded on Berry's time clocks in work weeks where its employees' total hours worked exceeded forty.

26. This action is filed as a collective action pursuant to Section 16(b) of the Fair Labor Standards Act, 29 USC § 216(b), on behalf of Howard and on behalf of all Berry hourly-paid employees who were damaged by Berry's compensation system which resulted in unpaid overtime compensation. By virtue of the "collective action," Howard represents the substantially similar interests of former and current coworkers denied overtime compensation. Howard anticipates that other Berry employees and former employees will opt-in to the action.

27. Particularly with the types of wage claims and practices at issue in this case, there are questions of law and fact that are common to the entire collective group/class.

28. Howard will act to fairly and adequately protect the interests of the entire collective group/class of current and former Berry employees.

29. A determination regarding the similarity of those able to participate in the collective action would also allow litigation of claims that may not otherwise be cost effective, depending upon the amount of each individual group member's damages. Particularly with the type of FLSA wage violations at issue in this litigation, some, if not most, of the individual group members may not be aware of their rights to their wages under the FLSA, or may not, because of financial means or experience, be in a position to seek the assistance of counsel to commence individual litigation.

### IV.  JURISDICTION AND VENUE

30. This Court has jurisdiction over Howard's FLSA claims under 28 USC § 1331, as those FLSA claims raise a question of federal law. See 29 USC § 201 et seq. The Court has supplemental jurisdiction over Howard's Indiana statutory wage law claim, which has a common basis in fact with his FLSA claims.

31. This Court is the appropriate venue for this cause of action as Berry is headquartered in Evansville, Vanderburgh County, Indiana, and much of the illegal activity took place in the Southern District of Indiana. 28 USC § 1391.

## V. FAIR LABOR STANDARDS ACT CLAIMS

32. Howard incorporates herein by reference paragraphs 1 through 31 above.

33. Berry is an "enterprise," as that term is defined by the FLSA, covered by the overtime and minimum wage provisions of the FLSA. Berry is an "employer," as that term is defined by the FLSA. Berry is a "person" as that term is defined by the FLSA.

34. Berry has violated Howard's right and the right of every similarly situated coworker of Howard to be properly paid overtime wages in a manner required by the FLSA.

35. Berry has repeatedly violated the FLSA's overtime provisions by not paying Howard and members of the Plaintiff Class wages at the required overtime compensation rate for all recorded hours of work in weeks where total hours worked exceeded forty.

36. Berry's failure to comply with the FLSA's provisions regarding overtime compensation is willful and without justification, and subjects Berry to a three-year statute of limitations.

37. Howard and the Plaintiff Class seek all available damages, including unpaid overtime compensation, liquidated damages, payment of reasonable attorney's fees, costs and

expenses, and any and all other damages to which they may be entitled for Berry's violations of their rights under the Fair Labor Standards Act.

## VI.  PRAYER FOR RELIEF

WHEREFORE, Howard, individually and on behalf of members of the collective group of current and former employees of Berry, respectfully requests that the Court enter judgment against Berry and issue all available relief to Howard and to the entire collective group, including, but not limited to, the following:

1. All damages available under the FLSA, including all unpaid overtime wages, all liquidated damages, and payment of all reasonable attorney's fees, costs and expenses;

2. All unpaid and underpaid wages;

3. All reasonable attorney's fees and expenses;

4. Costs;

5. Pre-judgment and/or post-judgment interest, if available;

6. Any and all other relief just and proper in the premises.

Respectfully submitted,

HASSLER KONDRAS MILLER LLP

By/s/Robert P. Kondras, Jr.
Robert P. Kondras, Jr.
Attorney No. 18038-84
100 Cherry Street
Terre Haute, IN 47807
(812) 232-9691
Facsimile: (812) 234-2881
kondras@hkmlawfirm.com

        */s/Hans A. Nilges*
        Hans A. Nilges (OH Bar 0076017)
        Shannon M. Draher (OH Bar 0074304)
        **Nilges Draher LLC**
        7266 Portage Street, N.W., Suite D
        Massillon, OH 44646
        Telephone: (330) 470-4428
        Facsimile: (330) 754-1430
        Email: hans@ohlaborlaw.com

        Robi Baishnab (OH Bar 0086195)
        **Nilges Draher LLC**
        34 N. High St., Ste. 502
        Columbus, OH 43215
        Telephone: (614) 318-9738
        Facsimile: (330) 754-1430
        Email: rbaishnab@ohlaborlaw.com

        *Counsel for Plaintiff*

## ***REQUEST FOR TRIAL BY JURY***

Comes now Plaintiff Corbin J. Howard, by counsel, and requests a trial by jury on all issues which may be tried to a jury.

        Respectfully submitted,

        HASSLER KONDRAS MILLER LLP

        By /s/Robert P. Kondras, Jr.
        Robert P. Kondras, Jr.